UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JEANNE NAMUGISHA, INDIVIDUALLY AND AS NATURAL PARENTS AND GUARDIANS OF N.C., A MINOR; AND INNOCENT CYUBAHIRO, INDIVIDUALLY AND AS NATURAL PARENTS AND GUARDIANS OF N.C., A MINOR; | 4:19-CV-04087-LLP |
| Plaintiffs, | |
| vs. | ORDER ON DEFENDANT'S MOTION TO QUASH OR FOR PROTECTIVE ORDER |
| AVERA MCKENNAN HOSPITAL | Docket No. 38 |
| Defendant. | |

**INTRODUCTION**

This matter is before the court on the amended complaint alleging medical negligence and other claims by plaintiffs Jeanne Namugisha and Innocent Cyubahiro, individually and as parents of N.C., their minor child. The claims arise out of the July 31–August 1, 2017, labor and delivery of N.C. by Jeanne.  Jurisdiction is premised on the diverse citizenship of the parties[1] and an amount in controversy in excess of $75,000.  See 28 U.S.C. § 1332.

---

[1] Plaintiffs were, at the time of the filing of this lawsuit, residents of Texas while defendant is a South Dakota resident.

Although numerous defendants were initially named in the plaintiffs' complaint (see Docket No. 1), by agreement of the parties only Avera McKennan Hospital remains a named defendant, the other defendants having been dismissed without prejudice.  See Docket No. 15.  Now pending is defendant's motion to quash a Rule 30(b)(6) deposition served on it by plaintiffs or, in the alternative, for a protective order regarding that deposition notice.  The Honorable Lawrence L. Piersol, district judge, referred the defendant's motion to this magistrate judge for a decision pursuant to 28 U.S.C. § 636(b)(1)(A) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## FACTS

The facts pertinent to the instant motion are taken for the most part from plaintiffs' amended complaint.  Docket No. 3.  The court intends to imply no imprimatur of veracity reciting facts from that document.  Rather, the facts are intended to flesh out what the claims and, in so far as is relevant, defenses in this lawsuit are so as to evaluate the parties' arguments regarding the discovery requested.

Plaintiffs' overarching theory is that a "complete system failure" at the hospital occurred whereby Jeanne and N.C. were not monitored or attended to adequately such that N.C. was deprived of oxygen for hours while her umbilical cord was wrapped around his body and neck during labor.

Jeanne's pregnancy with N.C. was her second, her first child having been delivered by cesarean section.  She was told by defendant that she would be a good candidate to attempt vaginal delivery of N.C.

On the evening of July 31, 2017, Jeanne reported to defendant's midwifery clinic complaining of nausea and a headache.  She was diagnosed with preeclampsia and admitted to the hospital labor and delivery unit.  At this point, Jeanne was approximately six days past her expected delivery date.

When Jeanne's labor was not progressing satisfactorily, she was given four Pitocin infusions late in the evening on July 31.  Her labor continued to progress, but slowly.

Defendant's doctor assigned to monitor Jeanne's labor and delivery, Dr. Anette Siewert, began her shift at the hospital at 7 a.m. the morning of August 1, but did not check on the status of Jeanne at bedside then or that entire day until 3:30 p.m.

At 8:28 a.m. on August 1, defendant's certified nurse midwife, Audra DeGroot, artificially ruptured Jeanne's membranes in an attempt to further her labor.  Shortly after this procedure, plaintiffs allege N.C.'s heartrate began to show signs of early decelerations.  Such decelerations were noted at 8:28 a.m., 9 a.m., 9:30 a.m., 10:30 a.m., and 11:07 a.m.  Variable decelerations were noted at 9:58 a.m.  According to plaintiffs, defendant did not educate Jeanne about the significance of these fetal heartrate decelerations.

At 11:16 a.m. Jeanne was given another infusion of Pitocin and thereafter became fully dilated and 100% effaced—ready to give birth, in other

words.  N.C. continued to experience variable heartrate decelerations and no one educated Jeanne about the significance of this.

At 3:30 p.m., Dr. Siewert appeared at Jeanne's bedside for the first time on August 1.  She discussed with Jeanne conducting a vacuum-assisted delivery.  Dr. Siewert applied the vacuum at 3:56 p.m. and N.C. was born at 4:03 p.m.  N.C.'s umbilical cord was wrapped around her neck twice as well as her entire body once.  Damage to N.C. was immediately apparent upon her birth as evidenced by APGAR[2] scores of 1, 3, and 4 at one minute, five minutes and 10 minutes post-delivery (respectively) and abnormal blood gas PH/Base from N.C.'s arterial umbilical cord.  At 10:32 p.m. on August 1, six hours after N.C.'s delivery, Dr. Siewert recorded in her notes that Jeanne had "adamantly" declined earlier delivery of N.C. by cesarean section.

Following her birth, N.C. remained hospitalized for twenty days.  Upon her discharge from defendant, she was diagnosed with neonatal encephalopathy, neonatal seizures, feeding difficulty due to neurologic deficit, and patent foramen ovale.  N.C. was later diagnosed with cerebral palsy.

---

[2] A perfect APGAR score is 10.  The name of the test is an acronym for five indicia health care providers check for in a newborn immediately after birth: **A**ppearance (skin color), **P**ulse (heartrate), **G**rimace (reflexes), **A**ctivity (muscles), and **R**espiration (breathing).  Each of the five indicia can be given scores of 0, 1 or 2.  So, for example, a score of 0 for skin **A**ppearance means the baby is blue or pale all over, a score of 1 means the trunk is pink but hands and feet are blue, and a score of 2 means the baby's skin is pink all over.  A 0 for **P**ulse means there is no pulse, a 1 means the pulse is less than 100 beats per minute (bpm) and a score of 2 means a heartrate of 100 or more bpm.  A 0 for **G**rimace means the baby does not respond to pain, etc.  <u>See</u> https://www.drugs.com/cg/the-apgar-score.html.  All internet citations in this opinion last checked February 16, 2021.

Plaintiffs allege the injury to N.C. could have been prevented if defendant had been properly monitoring Jeanne and N.C. and effectuated a vacuum delivery sooner before the injury to N.C. occurred.

Plaintiffs assert defendant was negligent in a myriad of ways, but especially pertinent to this motion are allegations of inadequate monitoring of Jeanne and N.C., inadequate education of Jeanne during labor, failure to respond to indicia of fetal duress, delaying Jeanne's delivery, failure to adequately staff the labor and delivery ward, failure to maintain an adequate nurse-to-patient ratio, failure to adhere to "principles of a culture of safety," and "complete system failure." See Docket No. 3 at p. 13.

Plaintiffs served defendant with a notice to take its deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). Rather than listing names of persons to be deposed, Rule 30(b)(6) allows parties to list subject areas they wish to inquire into of an organizational defendant. The defendant then must select persons to be deposed on those subjects and educate them so that they can testify intelligently about the subject. A deponent offered up by an organizational defendant pursuant to a Rule 30(b)(6) notice provides testimony that is binding on the organizational defendant.

Plaintiffs' Rule 30(b)(6) notice to defendant contains nine subject areas of inquiry, with 138 subparts. See Docket No. 40-3. Thus, plaintiffs ask defendant to designate deponents who can testify as to 138 discrete areas of inquiry. Id. Defendant moves to quash the notice as excessive or, alternatively, to grant a protective order drastically limiting the areas plaintiffs

5

should be allowed to inquire into.  <u>See</u> Docket No. 38.  Plaintiffs resist the

motion.  <u>See</u> Docket No. 42.

## DISCUSSION

**A.    Good Faith Conferral and Text of Rule 30(b)(6)**

Initially, the court notes any party wishing to file a discovery motion

must first meet with the opposing party and attempt in good faith to resolve the

dispute.  Defendant alleges it has satisfied this requirement and plaintiffs do

not dispute that assertion.  Thus, the court addresses the merits of the motion.

Rule 30 states in subpart (b)(6) as follows:

> **(6) *Notice or Subpoena Directed to an Organization*.**  In its
> notice or subpoena, a party may name as the deponent a public or
> private corporation, a partnership, an association, a governmental
> agency, or other entity and must describe with reasonable
> particularity the matters for examination.  The named organization
> must designate one or more officers, directors, or managing agents,
> or designate other persons who consent to testify on its behalf; and
> it may set out the matters on which each person designated will
> testify.  *Before or promptly after the notice or subpoena is served,
> the serving party and the organization must confer in good faith
> about the matters for examination.  A subpoena must advise a
> nonparty organization of its duty to confer with the serving party
> and to designate each person who will testify.*  The persons
> designated must testify about information known or reasonably
> available to the organization.  This paragraph (6) does not preclude
> a deposition by any other procedure allowed by these rules.

<u>See</u> Fed. R. Civ. P. 30(b)(6).  The two sentences in italics were added to Rule

30(b)(6) on December 1, 2020, approximately two weeks after plaintiffs served

their deposition notice on defendants.  <u>See</u> Advisory Committee Notes to the

2020 Amendment.  Those sentences are therefore inapplicable to this dispute

and will not be discussed further.

Defendant's objections, like plaintiffs' subparts, are myriad. It is most efficient to discuss each objection in the context of the subject area of the deposition notice.

**B.    Plaintiffs' Nine Categories of Subjects and Subparts Thereof**

**1.    Subject Area I and its 22 Subparts**

The first subject area plaintiffs list in their deposition notice is:

I.    Avera's Electronic Medical Record System utilized for Jeanne
. . . and N.C., including:

    a.    functionality;
    b.    changes;
    c.    deletions;
    d.    times, time stamping and time dating;
    e.    MEDITECH Client Server EMR version 5.67 PP3;
    f.    OBIX;
    g.    meta data:
        i.    purging of meta data;
        ii.    persons responsible for retaining the meta data;
        iii.    policies for retaining meta data;
        iv.    persons responsible for setting the policies for
retaining meta data;
        v.    efforts made to retrieve meta data;
    h.    audit trails and audit trail parameters;
        i.    purging of audit trails and audit trail
parameters;
        ii.    persons responsible for retaining audit trails and
audit trail parameters;
        iii.    policies for retaining audit trails and audit trail
parameters;
        iv.    persons responsible for setting the policy for
retaining audit trails and audit trail parameters;
        v.    efforts made to retrieve audit trails and audit
trail parameters;
    i.    the identity of MEDITECH representatives for the
Avera EMR utilized in this matter;
    j.    communications with MEDITECH representatives
concerning Section I subject matter;
    k.    integration with OBIX; and
    l.    the capacity to generate a complete EMR displaying all
changes and times of entries.

See Docket 40-3 at pp. 1-2.  None of the technical terms used in the above request are defined in the plaintiffs' Rule 30(b)(6) notice.  Id.  Defendant indicates in its brief that Meditech is its electronic medical record vendor.  OBIX is defendant's fetal heart monitoring strip software and GE-Corometrics is defendant's corresponding fetal heart monitoring strip hardware.  See Docket No. 39 at p. 10.

The court finds plaintiffs' request to be relevant.  The gravamen of their case is that because of Jeanne's prior cesarean delivery and preeclampsia on the day she was admitted to the hospital, and because N.C. began to experience decelerations in her heartrate after Jeanne's membranes were stripped on the morning of August 1, 2017, defendant should have been monitoring both Jeanne and N.C. closer and, had defendant properly monitored them, injury could have been avoided.  The status of Jeanne and N.C. throughout the day is relevant.  That would be expected to be recorded in defendants' medical record-keeping system, which happens to be electronic.  Some of the data plaintiffs requested is missing or has been purged.  It is entirely relevant for plaintiffs to inquire as to what was kept, what was purged, why it was purged, what the defendant's policy was, etc.  Furthermore, interpreting the records that have been produced to plaintiffs will be enhanced by an understanding of how the system works.

Defendant argues that this discovery request is disproportionate to the needs of the case.  The words "proportionate" and "disproportionate" imply a comparison between two things.  For example, the volume and depth of

8

discovery on the 9/11 collapse of the World Trade Center's Twin Towers where over 3,000 lives were lost might be quite allowably vast, while the same level of discovery on a generic automobile accident case with minor injuries would be disproportionate.

In fact, the Rule makes this comparison explicit:  the scope of discovery extends to any nonprivileged matter relevant to a claim or defense "and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits."  See FED. R. CIV. P. 26(b)(1).

Defendant emphasizes the burden to itself posed by plaintiffs' discovery request, but does not complete the analysis by comparing that to the needs of the case or the importance of the issues at stake.  Defendant does not even attempt to quantify the burden to itself. It does not set forth the cost of how expensive the discovery is anticipated to be nor does defendant provide an estimate of the man hours involved in satisfying the discovery requests.  Both halves of the proportional argument are left not stated, or not fully expressed. A party resisting discovery cannot merely argue that it is an undue burden.  It must demonstrate specific facts about the burden and show why it is undue. Penford Corp. v. Nat'l Union Fire Ins. Co., 265 F.R.D. 430, 433 (N.D. Iowa 2009); St. Paul Reinsurance Co. v. Commercial Fin. Corp., 198 F.R.D. 508, 511 (N.D. Iowa 2000).  The articulation of mere conclusory objections that

something is "burdensome" is insufficient to carry the resisting party's burden—that party must make a specific showing of reasons *why* the relevant discovery should not be had.  Cincinnati Ins. Co. v. Fine Home Managers, Inc., No. 4:09CV234-DJS, 2010 WL 2990118, *1 (E.D. Mo. July 27, 2010); Burns v. Imagine Films Entm't, Inc., 164 F.R.D. 589, 593 (W.D.N.Y. 1996).

Furthermore, the fact that providing requested, relevant discovery will be burdensome and/or expensive is not in itself a reason for a court's refusing to order discovery which is otherwise appropriate.  See In re Folding Carton Antitrust Litigation, 83 F.R.D. 260, 265 (N.D. Ill. 1979) (stating that "[b]ecause the interrogatories themselves are relevant, the fact that answers to them will be burdensome and expensive 'is not in itself a reason for refusing to order discovery which is otherwise appropriate' " (citation omitted)); Alexander v. Parsons, 75 F.R.D. 536, 539 (W.D. Mich. 1977) (stating that "the mere fact discovery is burdensome . . . is not a sufficient objection to such discovery, providing the information sought is relevant or may lead to the discovery of admissible evidence"); and Burns, 164 F.R.D. at 593 (determining that the fact that answering interrogatories will require the objecting party to expend considerable time, effort, and expense consulting, reviewing, and analyzing huge volumes of documents and information is an insufficient basis for an objection).  Moreover, if discovery requests are relevant, the fact that they involve work, which may be time consuming, is not sufficient to render them objectionable.  See United States v. Nysco Labs., Inc., 26 F.R.D. 159, 161-62 (E.D.N.Y. 1960) and Rogers v. Tri-State Materials Corp., 51 F.R.D. 234, 245

(N.D. W. Va. 1970) (stating "[i]nterrogatories, otherwise relevant, are not objectionable and oppressive simply on grounds [that] they may cause the answering party work, research and expense"). Defendant has failed to carry its burden to demonstrate that the discovery is unreasonably onerous.

On the other side of the "proportional" balancing scales the court notes that plaintiffs' claims involve the loss of a normal human life. That is of an incalculable value. What price can one put on N.C.'s ability to experience life in all its stages with the use of all her faculties, something that has been now taken from her? What price can one put on a parent's anguish over knowing the chance for a normal life with all its joys and challenges has been taken from their child? Defendant has not shown that the discovery requested is disproportionate to the needs of the case or any other factors listed in Rule 26(b)(1).

However, at the risk of making defendant's argument for it, the court notes that plaintiffs' discovery request is not limited in duration or scope in any way. Is defendant really expected to provide all Meditech communications with every Meditech representative since defendant purchased the electronic records system up to the present? Is defendant required to provide someone to testify to each policy it has ever had regarding meta data or audit trails on the Meditech system from time immemorial? The court finds plaintiffs' request overbroad and therefore burdensome in this respect. The court will limit plaintiffs' request under subject area I to one year before N.C.'s birth.

Therefore, defendant must produce a deponent(s) that can testify about subject I and its subparts for the period from August 1, 2016, to August 1, 2017.

Defendant also argues that plaintiffs can get the information they seek by deposing fact witnesses. But defendants are not empowered to dictate the manner in which plaintiffs seek out discovery. Plaintiffs are free to use the methods available to them under the federal rules. Rule 30(b)(6) is a permissible tool for plaintiffs to use.

### 2. Subject Area II and its 28 Subparts

Plaintiffs' subject area II in their deposition notes states as follows:

II. Avera's electronic Fetal Heart Monitoring systems utilized for Jeanne Namugisha and N.C., including:

    a. functionality;
    b. changes;
    c. deletions;
    d. times, time stamping and time dating;
    e. OBIX Version 6.4;
    f. GE-Corometrics Model 259C (SIC) CPU V;
    g. alarms/alerts:
        i. triggered alarms/alerts;
        ii. silenced alarms/alerts;
        iii. alarm/alert recording;
        iv. record of silenced alarms/alerts;
        v. record of acknowledged alarms/alerts;
        vi. record of triggered alarms/alerts;
        vii. alarm/alert parameter settings;
        viii. disabled alarms/alerts;
        ix. alarm/alert volume;
    h. central monitoring;
    i. access points for healthcare providers to view the fetal heart monitor ("FHM");
    j. display locations for the FHM;
    k. purging of data;
    l. persons responsible for maintaining data;
    m. policies for retaining the data;
    n. persons responsible for setting the policies for retaining data;

      o.     efforts made to retrieve the data;

      p.     the identity of OBIX representatives for the Avera EMR utilized in this matter;

      q.     communications with OBIX representatives concerning Section II subject matter;

      r.     communications with GE-Core metrics [sic] representatives concerning Section II subject matter; and

      s.     integration with Meditech.

See. Docket No. 40-3 at pp. 2-3.

The court finds this request to be relevant.  Again, the gravamen of plaintiffs' claims is that there were warning signs from which defendant should have known to monitor Jeanne and N.C. more closely and that, if defendant had done so, injury to N.C. could have been prevented.  Whether defendant's OBIX system produced alarms as to N.C.'s heartrate, whether those alarms were heard or heeded, whether the parameters for alarms being triggered were reasonable, are all highly relevant to plaintiffs' claims.

Defendant again asserts its omnibus argument that the discovery is disproportionate to the needs of the case.  Defendant again fails to articulate what the burden to itself is and again fails to compare that to the nature of the case on the other side of the balancing scales.  Defendant thus fails to sustain its burden of demonstrating that the discovery sought is unreasonably onerous.

Once again, however, the court finds the fact that plaintiffs' request is not limited to any particular time or scope renders it overbroad.  Plaintiffs' request shall be limited to the time period from August 1, 2016, to August 1, 2017, and limited to those electronic record keeping/monitoring systems

13

actually used by defendant in attending to Jeanne while she was in labor with

N.C.  Within the scope of this time frame, defendants shall respond to subject

II and its subparts by providing an appropriate deponent(s).

### 3.   Subject Area III and its 16 Subparts

Subject III of plaintiffs' Rule 30(b)(6) deposition notice asks defendant to

produce a deponent(s) who can testify knowledgeably about the following:

> III.   Avera's paging, messaging and phone communication
> systems utilized by Avera's healthcare providers for
> Jeanne . . . and N.C., including:
>
> a.   functionality;
> b.   changes;
> c.   deletions;
> d.   times, time stamping, and time dating;
> e.   Voalte messaging;
> f.   insight data;
> g.   cloud data;
> h.   purging of data;
> i.   persons responsible for maintaining data;
> j.   policies for retaining the data and persons responsible
>      for setting the policies for retaining data;
> k.   efforts made to retrieve the data;
> l.   the identity of Voalte representatives for the systems
>      utilized in this matter;
> t.   communications with Voalte and/or other paging
>      messaging and phone systems representatives
>      concerning Section III subject matter;[3]
> m.   the laborist cell phone;
> n.   downloads from the laborist cell phone; and
> o.   policies, practices and procedures for the laborist cell
>      phone.

See Docket No. 40-3 at p. 3.  The court finds this request to be relevant.  It

seeks to discover what was known by whom at what time and to whom that

---

[3] No explanation is provided in the record why this subpart of subject area III is
labeled "t" instead of continuing the sequence with "m."

knowledge was communicated.  To the extent this information is not available because it has been purged, never retained, or otherwise is not retrievable, it is relevant to inquire as to why that is.

Defendant explains that Voalte is defendant's paging system and its messaging and phone communication system used by its providers.  It objects to plaintiffs' inquiry into Voalte because defendant has already informed plaintiffs that it has not retained any data from Voalte dating back to July 31–August 1, 2017, and has provided affidavits to that effect, explaining in the affidavits what steps had been taken to attempt to retrieve the data.  In addition, defendants argue the medical records already show who contacted whom at what times, so the request is duplicative.

If the state of discovery is as defendant represents, the deposition on the subject of the Voalte system should take about five minutes.  Plaintiffs have a right to inquire about what is normally retained, why this data was not retained, and what efforts were made to find the data.  And the medical records might not be congruent with the information in the Voalte system.  The Voalte system would have recorded communications electronically in real time as they occurred.  The medical records, as evidenced by Dr. Siewert's entry six hours after N.C.'s birth, are not necessarily contemporaneous with the events they describe.  When describing an event after the fact, one's perception of the event can be colored by subsequent developments in a way that contemporaneous recording might not be skewed.

Regarding the laborist cell phone, defendant states it contacted Verizon, which provided a call log from the phone.  Thus, the data about this cell phone originated with Verizon, not with defendant.  Defendant argues if there are numbers on the call log plaintiffs are curious about, they can ask about them in written discovery.  Again, though, defendant cannot dictate whether plaintiffs seek to obtain the discovery through a deposition or through an interrogatory.

Briefing from the parties suggest that fact witnesses may have been deposed in the interim between when defendant filed its motion to quash and the writing of this opinion.  If plaintiffs have already deposed the laborist and had an opportunity to ask her about the call log, the court will quash that part of plaintiff's Rule 30(b)(6) deposition notice concerning the laborist cell phone as duplicative.  If the laborist has not yet been deposed, the court will not quash that part of the deposition notice.

Plaintiffs' inquiry into subject area III is limited to the one-year period from August 1, 2016, to August 1, 2017.

### 4.     Subject Area IV and its 13 Subparts

Plaintiffs ask defendant to provide a deponent(s) who can testify to these areas under subject IV:

> IV.   Avera's access badges utilized by Avera's healthcare providers for Jeanne . . . and N.C. on the dates caring for Jeanne . . . and N.C., including:
>
> a.     functionality;
> b.     changes;
> c.     deletions;
> d.     times, time stamping and, [sic] time dating;

     e.    access badge data:
           i.    purging of data;
           ii.   persons responsible for maintaining data;
           iii.  policies for retaining the data;
           iv.  persons responsible for setting the policies for retaining data;
           v.   efforts made to retrieve the data;
     f.    the systems;
     g.    hardware and software; and,
     u.    communications with manufacturers and vendors concerning Section IV subject matter.[4]

See Docket No. 40-3 at p. 3.

During the day on August 1, 2017, Dr. Siewert and certified nurse midwife DeGroot saw patients at defendant's clinic while Jeanne was in labor. The clinic was in a separate building from the building where Jeanne was laboring. Plaintiffs seek to explore this issue as a possible reason why defendant was not monitoring Jeanne and N.C. more closely and acting more quickly on the information garnered by such monitoring.

Defendant objects to this area of inquiry because, like the pager data, it has told plaintiffs that data about access badges on August 1, 2017, is no longer available. Again, it is valid for plaintiffs to inquire into why this is so, who made the protocol for preserving this data, whether the data was preserved in accord with or contrary to that protocol, and what efforts were made to uncover the data. The deposition should be brief if the answer is that the data no longer exists. The deponent need only testify to what the policy was on August 1, 2017, regarding preservation of access badge data, that the

---

[4] No explanation is provided in the record why the last subpart of subject area IV is labeled "u" instead of "h."

data from Dr. Siewert and Ms. DeGroot's access badges was/was not preserved according to that policy, and what efforts were made to find the data.  It should not be burdensome for defendant to prepare a deponent to testify to this limited inquiry.

As with each of the above areas of inquiry, the court limits inquiry into subject area IV to the one-year period from August 1, 2016, to August 1, 2017.

### 5.  Subject Area V and its 29 Subparts

In subject area V, plaintiffs ask defendant to designate a deponent to testify to this information:

V.  Avera's Women's Center CNM and OBGYN clinic and labor & delivery staffing and scheduling applicable to Avera's healthcare providers for Jeanne . . . and N.C., including:

    a.    shift and hour requirements;
    b.    call requirements;
    c.    plan for conflict with clinic patient load;
    d.    minimum RVU requirements;
    e.    minimum billing requirements;
    f.    minimum clinic day and hour requirements;
    g.    pay structure;
    h.    pay schedule;
    i.    bonus structure;
    j.    budgeting;
    k.    resource allocation;
    l.    financial requirements;
    m.    financial parameters;
    n.    overtime;
    o.    bonus;
    p.    vacation;
    q.    quotas;
    r.    the persons responsible for staffing, scheduling and assignment;
    s.    clinic manager;
    t.    CNM position description;
    u.    OBGYN employment contracts;
    v.    staffing and scheduling reviews;
    w.    staffing and scheduling assessments;

      x.      census;
      y.      census reviews and assessments;
      z.      distance from the clinic to L&D, floor plans;
      aa.    hospital building additions;
      bb.    hospital building renovations;
      cc.    campus expansion; upgrades and improvement and, corresponding cost allocations.

See Docket No. 40-3 at p. 4.

Plaintiffs seek through this subject area to discover if defendant imposes requirements for shifts, calls, billing, or clinic hours on its doctors and nurses that jeopardize patient care in labor and delivery.  This is a valid line of inquiry, but the court limits it solely to doctors and nurses who work in the defendant's women's care clinic and also in labor and delivery.  The court also limits this line of inquiry to the circumstances and policies that existed between August 1, 2016, and August 1, 2017.

Plaintiffs also seek to discover if defendant provided remuneration to its doctors and nurses involved in labor and delivery in such a way that patient care was impacted.  This, too, is a valid line of inquiry.  The court limits this line of inquiry to doctors and nurses who worked in both defendant's women's clinic and in labor and delivery.  The discovery is limited to the one-year period from August 1, 2016, to August 1, 2017.

As to the position descriptions, defendant objects to providing a deponent because it has already provided the written documents containing these descriptions.  Again, the area is relevant.  Plaintiffs may wish to know who drafted the descriptions and what input was used to do so.  Such inquiry

19

would be brief.  The fact that the written descriptions themselves have been provided in discovery is not a valid objection to inquiry on those documents.

Plaintiffs' requests for a deponent to testify to "resource allocation," "budgeting," and "financial requirements/parameters" are too vague.  The court cannot discern whose resources or whose financial requirements are being delved into.  Finally, budgeting for an enormous hospital such as defendant is simply too broad.  Defendant need not provide deponents ready to testify to budget items such as advertising, charitable solicitations, podiatry or orthopedics, just to name a few areas included in "budgeting."

The group of inquiries into additions, renovations, etc. at the defendant's campus is overbroad as well.  Plaintiffs have stated they seek to determine how much time was required each time Dr. Siewert or nurse DeGroot had to travel from labor and delivery to the clinic to see other patients and to return back to labor and delivery.  As with the access badge data, this is a relevant inquiry, but the inquiry as stated is not limited to that focus.  Therefore, this group of inquiries is limited to any construction or renovation affecting the line of traverse from labor and delivery to the women's clinic on the days of July 31–August 1, 2017.  Only the existence, nature, and extent of any such construction or renovation need be disclosed.  Cost allocations and unrelated inquiries are not relevant.

Defendant argues that the request for assessments of staffing, scheduling or census that were done for August 1, 2017, constitute peer review material that is protected by South Dakota's peer review privilege.  But

20

defendant never states whether any such reviews even exist.  If defendant is claiming a privilege, Rule 26 is explicit about what defendant must show. Defendant must (1) specifically invoke the privilege and (2) describe the documents, communications or tangible things not produced or disclosed in a manner that does not reveal the content of the information itself, but which contains enough details to allow others to assess the claim of privilege.  See FED. R. CIV. P. 26(b)(5)(A).  Defendant has not even attempted to make the second showing before this court.[5]  On this record, the court rejects defendant's assertion of privilege as insufficiently supported.

### 6.    Subject Area VI and its 15 Subparts

In subject area VI, plaintiffs ask defendant to designate a deponent to testify to this information:

VI.    Avera's Safety Culture and Culture of Safety applicable to Avera's healthcare providers for Jeanne . . . and N.C., including:

    a.    policies;
    b.    procedures;
    c.    safety plans;
    d.    quality plans;
    e.    systems;
    f.    process review;
    g.    adequacy of staffing;
    h.    leadership;
    i.    governing body;
    j.    joint commission accreditation;
    k.    sentinel events;

---

[5] In briefing defendant asserts it served privilege logs on plaintiffs.  That is unavailing to this court if the nature of those logs and the documents shielded pursuant to them are not described to the court.  Simply asserting privilege logs were created and served does not allow this court to evaluate the claim of privilege.  Again, in briefing to this court, defendant does not even state whether any documents, information, or communications are being withheld.

        l.     sentinel event alerts;
        m.   patient safety;
        n.    reporting; and, [sic]
        o.    assessments.

<u>See</u> Docket No. 40-3 at pp. 4-5.

Defendant characterizes this subject area as "confusing." Defendant notes that many of plaintiffs' allegations and requests have used the terms "safety culture" and "culture of safety" without ever defining those terms. The court agrees. It appears plaintiffs may be using the phrases as a term of art and, without definition of them, it is a trap for the unwary.

Plaintiffs attempt to argue that the subject area is defined as *Avera's* culture of safety and that defendant, therefore, must know what it is. The court notes plaintiffs use the phrase culture of safety in their initial complaint, long before Avera provided any safety-related documents in discovery. Plaintiffs must provide a definition of these terms and, based on that definition, defendant may then be able to ascertain which deponent(s) to designate. Plaintiffs should provide their definition within 15 days of the date of this order. Plaintiffs' area of inquiry is limited to culture of safety policies that apply to the labor and delivery department and limited in time to that period from August 1, 2016, to August 1, 2017. With those limitations, this area of inquiry is allowed.

Defendant again asserts the peer review privilege to the areas of "process review," "adequacy of staffing," "sentinel event alerts," "reporting," and "assessment." This assertion of privilege is rejected on this record. As with subject area V, defendants explicitly make the claim of privilege, but they do

not describe the information being withheld at all—defendant does not even affirmatively confirm that any information *is* being withheld.  Because defendant does not satisfy the second prong of Rule 26(b)(5)(A)'s requirement for establishing a claim of privilege, such claim is rejected.[6]

### 7.   Subject Area VII and its 5 Subparts

In subject area VII, plaintiffs ask defendant to designate a deponent to testify to this information:

> VII.   Avera's Women's Center nurse-training and competency for the Avera Nurse healthcare providers caring and treating Jeanne . . . and N.C. on July 31–August 1, 2017 including:
>
> a.   education;
> b.   performance reviews;
> c.   remedial measures;
> d.   discipline;
> e.   licensure; and, personnel files.

See Docket No. 40-3 at p. 5.

Defendant objects to this inquiry as unduly burdensome.  As with that claim made and discussed above, defendant makes no attempt to quantify the expense or man hours required to prepare a deponent to testify to the subject described in area VII.  Because the information is clearly relevant, defendant bears the burden of showing that it is too onerous to be allowed.  Defendant's bare recital of the phrase "unduly burdensome" is insufficient to carry the day.

Defendant again asserts that this information is protected by South Dakota's peer review privilege.  But again, defendant's impassioned argument about the sanctity of the peer review process and the policy undergirding that

---

[6] See also footnote 4, *supra*.

privilege simply does not score the runner.  Defendant again never indicates if there is information being withheld, let alone describes the information with sufficient detail to allow plaintiffs or this court to evaluate the claim of privilege.  Surely the inquiry into whether nurse DeGroot or certified nurse midwife Vangerpen had an educational degree of some kind and what the subject of that degree was is not privileged?  Likewise, performance reviews and discipline may or may not touch on anything related to peer review.  Defendant has not provided enough information to sustain its claim of privilege.

This inquiry is allowed, but limited to nurses DeGroot and Vangerpen and limited to what the status of their education, licensure, disciplinary record, and performance reviews were as of July 31–August 1, 2017, as related to their roles as healthcare providers.  So, for example, if one of them previously attended vocational school to train as a welder, that would not be relevant to their role as healthcare providers.  Only that education, licensure, and other topics listed related to their roles as healthcare providers need be disclosed.  If either of them was disciplined or received performance reviews or education after the date of N.C.'s birth, it is either not relevant or, if based on the care rendered to N.C. and Jeanne, it would seem to obviously be privileged.

Defendant seeks to limit this inquiry to DeGroot and Vangerpen's knowledge, education, training, licensure or experience specifically as to a laboring mother with preeclampsia and a fetus who experiences heartrate declinations after the mother's membranes have been stripped, or some other similarly very limited topical scope.  Although these are relevant areas of

24

inquiry, the court is not in a position to state that these are the *only* relevant areas of inquiry. Therefore, as long as the inquiry concerns education, training, licensure, experience, or knowledge related to labor and delivery in existence as of July 31–August 1, 2017, the court will not otherwise limit the scope of this area.

### 8.   Subject Area VIII and its 4 Subparts

In subject area VIII, plaintiffs ask defendant to designate a deponent to testify to this information:

VIII.   Avera's peer review process:

    a.   generally;
    b.   how it works;
    c.   who is involved;
    d.   when it applies.

See Docket No. 40-3 at p. 5.

Defendant's first objection to this subject of inquiry is that it is irrelevant. But, as discussed above, defendant has repeatedly asserted the peer review privilege without ever indicating if defendant in fact is withholding any document, communication or information and without disclosing any details that would allow the court or plaintiffs to assess the claim of privilege. Defendant's established procedure for peer review is certainly relevant in that it will assist plaintiffs to evaluate defendant's claim of privilege.

To analogize, suppose one were deposing a witness who invoked the attorney-client privilege. The inquiring lawyer would be allowed to ask questions such as, "Where were you when you had this discussion?" "Were there other persons present?" "Was the person you had the discussion with a

lawyer or a lawyer's staff person?"  "Did you know that person was a lawyer or employed by a lawyer?"  "Why did you have the discussion with this person (i.e. was it in expectation of receiving legal advice?)."  All of these questions would be allowable to determine if the claim of attorney-client privilege lies.

Similarly, knowing the procedure provided in defendant's bylaws and other organizational documents for peer review sheds light on the likelihood or unlikelihood of any particular claim of peer review privilege made by defendant in this litigation.  It is fair game to learn how the process works in the abstract. It goes without saying that plaintiffs may *not* inquire into any specific peer review process undertaken by defendant—in plaintiffs' or any other patient's case.  Just as with the attorney-client privilege example above, the lawyer conducting the deposition may not inquire as to the substance of the deponent's discussion with his or her lawyer.

Defendant's final objection is that it does not know what plaintiffs have in mind when they use the term "peer review."  This argument seems specious, especially if defendant has a process described in its bylaws called "peer review."  But in the event defendant is truly befuddled, plaintiffs are required to provide defendant with a definition of "peer review" for purposes of subject area VIII within 15 days of the date of this order.  Thereafter, the deposition may proceed on this topic.  Again, the court limits the inquiry to the peer review process that would have been in place on or before N.C.'s birth and any peer review process that actually applied in Jeanne or N.C.'s case subsequent to August 1, 2017.

26

9.      **Subject Area IX and its 6 Subparts**

In subject area IX, plaintiffs ask defendant to designate a deponent to

testify to this information:

IX.     Avera's policies and procedures applicable to Avera's healthcare
        providers for Jeanne . . . and N.C., including:

        a.      all policies and procedures requested and produced;
        b.      medical staff bylaws;
        c.      medical staff rules and regulations manual;
        d.      medical staff operations and functions manual;
        e.      the Avera patient brochure; and,
        f.      the matters addressed in the Block and Borchardt affidavits.

See Docket No. 40-3 at p. 5.

Defendant argues that this subject area is irrelevant.  Defendant asserts

that plaintiffs' case will rise or fall depending on what the experts testify the

standard of care is and whether defendant's employees met or fell below that

standard of care.

Of course, that is true of the claims resting on the actions of plaintiffs'

doctor and certified nurse midwives, but plaintiffs have also sued the hospital

itself.  If its own policies and procedures encourage, mandate, or make

significantly more likely that care will be given that falls below the standard of

care, those policies and procedures are relevant to plaintiffs' claims against

defendant.

Defendant tacitly acknowledges this, but argues that the subject area is

too broad and therefore is unduly burdensome.  The court agrees.  These items

appear to be primarily documents, documents the court assumes were

obtained in discovery or could be obtained through discovery.  The bylaws and

27

policies and procedures the court imagines cover a vast array of topics from how many board members must be present to constitute a quorum to policies for selecting a CEO. If there are specific policies, procedures, or bylaws that plaintiffs wish to inquire into, they must state those with "reasonable particularity" within 15 days from the date of this order. Otherwise, the court will grant defendant's motion to quash this portion of the deposition notice.

Should plaintiffs narrow the scope of the subject matter for area IX, the court will allow them to explore this area in their deposition of defendant, but the court limits the deposition to those policies, procedures and bylaws specifically identified by plaintiffs and in existence as of July 31-August 1, 2017.

## CONCLUSION

At first blush, plaintiffs' Rule 30(b)(6) deposition notice appears excessive with nine subject areas and 138 subparts. But many of those subparts will require exceedingly brief testimony, many are very closely related to each other, and the court has excised some of them and limited others to a specific time frame. With these modifications as stated above, the court hereby

ORDERS that defendant's motion to quash or for a protection order is granted in part and denied in part as stated in this opinion.

## NOTICE OF RIGHT TO APPEAL

Pursuant to 28 U.S.C. § 636(b)(1)(A), any party may seek reconsideration of this order before the district court upon a showing that the order is clearly erroneous or contrary to law.  The parties have fourteen (14) days after service of this order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(A), unless an extension of time for good cause is obtained.  See FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)(1)(A).   Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely and specific in order to require review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED February 19, 2021.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge